(No. 19535.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ODO PUESCHELL, Plaintiff in Error.

*Opinion filed October 19, 1929—Rehearing denied Dec. 10, 1929.*

GEORGE H. GUENTHER, (BERNHARDT FRANK, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, A. V. SMITH, State's Attorney, and GEORGE P. O'BRIEN, (SIDNEY H. BLOCK, of counsel,) for the People.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

Odo Pueschell was indicted in the circuit court of Lake county for the murder of Wilma Miller. A jury trial resulted in a verdict finding Pueschell guilty and fixing his punishment at imprisonment in the penitentiary for life.

Judgment was rendered upon the verdict and he prosecutes this writ of error.

Wilma Miller was an unmarried woman, thirty years of age, and on May 7, 1927, had been employed as a servant in the home of Thorne Donnelley, at Lake Forest, in Lake county, for about six months. Mr. and Mrs. Donnelley were on their way home from Europe at the time and during their absence the house had been left in charge of Miss Miller. A short distance northeast of Donnelley's house stands the residence of Mrs. A. F. Ferry by whom Odo Pueschell, the plaintiff in error, twenty-two years of age, was employed as a chauffeur. Joseph Hairston, a colored man and a resident of Lake Forest for twenty years was an employee of that city. After his day's work for the city was done, he would go to Donnelley's residence and mow the lawn, attend the furnace, wash windows, polish floors and render other services similar in their nature. He had been so employed by Donnelley for three or four years.

A statement of the substance of the evidence introduced by the prosecution follows. It appears that Miss Miller desired to go to Chicago on the evening of Saturday, May 7, 1927, and had requested Hairston to turn on the lights in the house about the time of her departure. Hairston entered the house by way of the basement door between 6:30 and 6:45 P. M. He first looked to see whether the pilot light of the oil furnace was burning, then went up-stairs to the front hallway, turned on a light and found Miss Miller lying near the foot of the stairway leading to the second floor. Her dress was raised to her knees. He called her but she did not answer. About that time Pueschell descended the stairway. Hairston asked him where Miss Miller was and Pueschell answered, "She is out." Hairston replied, "Don't tell me that; what's she doing lying on the stairway with her clothes up?" to which Pueschell rejoined, "Huh, she's all right." Pueschell then turned and entered the hall. Hairston left the house

through the basement, drove his automobile to the police station, told Earl Dunn, a police officer, what he had discovered, and with the officer, each in his own car, returned to Donnelley's residence. Hairston entered the basement and ascended the stairway to the door through which he had passed to the hallway, but found the door locked from the inside. He went to the front door where officer Dunn was waiting, and it, too, was locked. Entrance to the house was finally gained through a side door. Hairston and the officer advanced to the hallway and they found Miss Miller still lying at the foot of the staircase. She was breathing and blood covered her head and face. A handkerchief had been thrust into her mouth, and Hairston withdrew it. There was also much blood on the first three or four steps of the staircase. Since life was not extinct, the two men removed Miss Miller to a hospital where she was examined by a surgeon. He found, in addition to the blood on her head and body, that her eyes were swollen, that she had five lacerated wounds on her head, some of which were depressed skull fractures, and that portions of the brain protruded from one or more of the wounds. Death soon ensued, and the surgeon expressed the opinion that it was caused by a skull fracture with lacerations of the brain tissue, and that the injuries could not have been caused by falling and striking the head against the steps or railing of the staircase.

After Hairston and officer Dunn had taken Miss Miller to the hospital, they went to Mrs. Ferry's residence and inquired of Ida Pueschell, a servant and aunt of the plaintiff in error, where he could be found. She answered that he was not at home. The men returned to the police station and later called at the Chicago and Northwestern railroad station to find him but they did not succeed. Accompanied by George Densmore, another police officer, they went to the home of John Dunn, a brother of Earl Dunn and also a police officer. Hairston and Earl Dunn returned

to Donnelley's house, while officers Densmore and John Dunn drove to Mrs. Ferry's house. Plaintiff in error had arrived at the home of Mrs. Ferry, his employer, a few minutes before in a taxicab driven by Frank Baldwin, and the latter was waiting to drive him back to the electric railway station. The same servant told officer Dunn that the plaintiff in error was not present but he left the house about that time through a rear door and was arrested. The two officers then took him to Donnelley's residence, where officer John Dunn asked Hairston whether the plaintiff in error was the man he had seen in the house earlier in the evening, and Hairston answered in the affirmative. Plaintiff in error, angered by the accusation, leaped at Hairston and pushed him back. Shortly thereafter, the plaintiff in error was taken to the police station and questioned in the presence of the mayor of the city and others concerning his acquaintance with Miss Miller, his presence in Donnelley's house, and his whereabouts during the preceding two hours. He denied that he was acquainted with Miss Miller or that he had ever entered Donnelley's house. He stated that he had boarded an interurban train bound for Chicago, but discovering that he had forgotten the keys to his aunt's apartment in that city, left the train at Fort Sheridan and returned to Lake Forest to get them.

A certain photograph taken from a drawer in Miss Miller's dresser showing her standing alongside an automobile, and a man's hat on the running-board, was exhibited to the plaintiff in error, but he denied any knowledge of the picture or acquaintance with the person photographed. He was asked whether the automobile shown in the picture belonged to Mrs. Ferry, and he answered that the car looked like the one she owned and that some chauffeur formerly employed by her might have taken the picture. A gold necklace and locket and gold ring with a green setting were taken from a pocket in his coat. He first denied any knowledge of them or of their presence in his

pocket, but later asserted that they belonged to his deceased mother and that he was going to show them to a girl named Freda and take them to Chicago for safe keeping. Two photographs were taken from the room in Mrs. Ferry's house occupied by the plaintiff in error. One, he admitted, showed him on the front porch of Donnelley's house. In the other, Miss Miller appeared alongside an automobile and there was a man's hat on the running-board. This picture was identical with the one taken from the drawer of the dresser in Miss Miller's room. Plaintiff in error afterwards admitted that he had seen Miss Miller but added that he was not well acquainted with her. He denied that Hairston had seen him in Donnelley's house.

Plaintiff in error was taken from the police station where he had been detained about two hours, to an undertaking establishment where the body of Miss Miller was held and he was asked whether he had been acquainted with her. He answered in the negative and denied striking or killing her. He was then taken to the county jail at Waukegan, and after further questioning retired at 2:30 A. M. On the following day, Sunday, May 8, the State's atorney, his assistant and the sheriff took the plaintiff in error back to Donnelley's house and questioned him. He again denied any acquaintance with Miss Miller or any participation in the crime. He admitted, however, that he had crossed Donnelley's premises the previous evening. Hairston, who was present, was asked to relate what he had seen and said in Donnelley's house on that evening and what the plaintiff in error had said in reply. Hairston did so and when he told how the plaintiff in error came down the staircase, the latter changed color and appeared to be nervous, but he did not answer.

With respect to the presence of the plaintiff in error on or about the premises of Thorne Donnelley several witnesses testified. Jennie Waris had been employed to assist Miss Miller for three days in April, 1927. Plaintiff in er-

ror called during her stay and she saw him engaged in conversation with Miss Miller in the hallway of Donnelley's house for half an hour. Ellen A. Peterson, one of Donnelley's neighbors, saw the plaintiff in error enter Donnelley's house through the front door on May 7, 1927, between 6 and 6:30 P. M. She saw him again later the same evening in the custody of the police, and had seen him enter Donnelley's premises two days before. Hairston, who was spading in the yard, also saw him approach Donnelley's house on the fifth of May. John Cavanaugh, while driving his cab shortly after 7 P. M. on May 7, saw the plaintiff in error near the sidewalk in front of Donnelley's residence, walking in a southwesterly direction. Thinking that the plaintiff in error might wish to ride to town, Cavanaugh reduced the speed at which his car was running, but the plaintiff in error manifested no intention to ride, and both proceeded on their respective ways.

At the Lake Forest station of the Chicago, North Shore and Milwaukee railroad, shortly after 7:15 P. M. on the evening in question, plaintiff in error entered a cab driven by Frank Baldwin. He took the rear seat, but changed to the front seat occupying it with the driver, and when the latter inquired where he desired to go, he directed him first to drive north, later east and finally south. When they reached Mrs. Ferry's residence, plaintiff in error told Baldwin to drive in, whereupon the driver, since he had gone twice the necessary distance, asked the plaintiff in error why he had not given his destination in the beginning. He did not answer the question, but told Baldwin he had forgotten some keys and wanted to be driven back to the station. Baldwin noticed that the plaintiff in error bit his finger nails and rubbed his hands during the trip. While Baldwin waited for him at Mrs. Ferry's house, officers Densmore and John Dunn arrived. They asked Baldwin who his passenger was, and the cab driver answered that

he was Mrs. Ferry's chauffeur. The arrest of the plaintiff in error followed.

Additional facts and circumstances were shown by the prosecution's evidence. Ida Pueschell, aunt of the plaintiff in error, signed and verified a statement in the office of the State's attorney to the effect that she had washed the handkerchief which was identified as the one used to gag Miss Miller; that the plaintiff in error obtained this handkerchief in Europe; that she had also washed two other handkerchiefs belonging to him and that she had marked her name upon the three handkerchiefs. On the witness stand she stated that she had been commanded to sign the statement and was excited when she signed it and she denied knowledge of the ownership of the handkerchiefs. She admitted, however, that she had stated that they belonged to the plaintiff in error. Two witnesses testified that she signed the statement understandingly and voluntarily. The handkerchiefs were introduced in evidence, but the written statement was not offered. With respect to the ring taken from the pocket of the plaintiff in error, two young women testified that they had seen the ring, or one exactly like it, in Miss Miller's possession. The coat worn by the plaintiff in error on the evening in question had stains on one of the sleeves. Dr. William D. McNally, chemist and toxicologist for the coroner of Cook county, examined these stains and pronounced them to be of human blood.

Plaintiff in error testified in his own behalf. He was born in Bucharest, Roumania, in 1905; emigrated to the United States in 1923; first worked in Brooklyn in a restaurant; was later employed in Chicago for three years, and about April 1, 1927, went to Lake Forest and became Mrs. Ferry's chauffeur. He first met Wilma Miller on a Sunday after he had taken Mrs. Ferry's family to church. Directed to return for them in about fifty minutes, he was on his way back to Mrs. Ferry's house when Miss Miller

and another young woman passed on the street. They had a camera and invited him to take pictures with them on the lake front. He accepted the invitation and drove them in Mrs. Ferry's automobile to a point near the lake. Pictures were taken and before returning to the church he brought the two young women to the driveway leading to Donnelley's residence. Later in the same week he met Miss Miller again at the front door to Donnelley's house. She told him that the pictures which they had taken were not ready but that if he would call at a certain drug store on the following evening she would give them to him. He met her as requested, accompanied her to her home and immediately returned to his place of abode. He met her on nearly every succeeding Sunday forenoon and occasionally took pictures with her, but he never entered Donnelley's house nor did he call there at night.

On the afternoon of the seventh of May the plaintiff in error drove an Italian gardener employed by Mrs. Ferry to the electric railway station in Lake Forest. He returned immediately and completed certain work which the gardener had left unfinished. Mrs. Ferry excused him for the day at 6:30 P. M., after which he walked to the business section of the city, bought a pair of shoes, returned to his room, shaved, bathed, dressed and obtained a ticket of several rides to go to Chicago on the electric railway. He walked to the station, passing Donnelley's house on the west, and waited from ten to twenty minutes before a train arrived. After boarding the train he discovered that he had forgotten the keys to his aunt's apartment in Chicago and left the train at Fort Sheridan to return to Lake Forest. He boarded another train going in the opposite direction, paid the conductor the fare in money for which he was given a receipt and put it in his pocket. At the Lake Forest station he took a taxicab and told the driver to go to Mrs. Ferry's home. When he discovered that he was being driven out of the way, he called the driver's at-

tention to the fact, whereupon the latter assured him there would be no extra charge for the longer trip. He found the desired keys in Mrs. Ferry's house and upon leaving met officer John Dunn. The officer questioned him about Miss Miller and he disclaimed any knowledge of what had happened to her. He was then taken to Donnelley's house. When he alighted from the automobile, the colored man came out of the house with blood on his hands and pointing to the plaintiff in error shook his fist and said, "That's the man, I swear it." Plaintiff in error was then handcuffed and officer Earl Dunn, who had just come out of the house with a hand full of blood, called him vile names, smeared the blood on his mouth, and said "Take him over and we will work on him; take him to the police station."

The command to take the plaintiff in error to the police station was obeyed and at the station his clothes were examined with a magnifying glass. He was pushed into a small room, knocked down while handcuffed, and told to confess or he would be killed. He protested his innocence and pleaded with the officers to stop beating him. His coat and hat were taken from him, and as an officer left, he said, "Fellows, work on him; keep on working." One officer, more kindly disposed than the others, told him to tell what he knew and assured him that he would be accorded fair treatment. Another officer entered the room at the time and in a peremptory tone ordered the kindhearted officer to leave stating that he would "take care of this boy." Plaintiff in error was beaten again and his face was washed twice. Shortly thereafter officer John Dunn came with a ring and four small pictures and addressing the plaintiff in error said that they had been found in his left pocket. The officer requested him to look at the pictures and asked whether the automobile shown in one of them belonged to Mrs. Ferry. Plaintiff in error answered that it did. He was then asked whether he was acquainted with the girl appearing in the pictures and he answered in

the negative. He denied that he had ever seen the ring before and he was certain that neither the ring nor the pictures were in the pocket as the officer stated for his suit had just been returned by the dry cleaners and the pockets were empty.

From the police station the plaintiff in error was taken handcuffed to an undertaking establishment to view the body of a dead woman. He could not identify the body as that of Miss Miller because her hair was bobbed while the dead woman's hair was long. After midnight he was lodged in the county jail at Waukegan. On Sunday morning he was returned to Lake Forest over a road running through sparsely settled territory. The car was driven slowly and the chief of police of Lake Forest, who sat in the rear seat with the plaintiff in error, struck him in the back several times with a leather receptacle filled with lead. The beating administererd by the officers at the police station caused his nose and mouth to bleed and his shirt was stained in consequence. After he had been confined in the county jail for several days, the deputy sheriff in charge forcibly removed the shirt and gave him another one instead. The blood-stained shirt was never recovered.

Plaintiff in error specifically denied that he was in Donnelley's house on the fifth or seventh of May; that he ever met Hairston in the hallway of that house; that he ever struck Miss Miller or that he ever had the handkerchief which gagged her in his possession. With respect to one of the pictures shown him by officer John Dunn, he admitted that he had taken it at the west side of Donnelley's house and that it showed Miss Miller standing alongside Mrs. Ferry's automobile. He denied that he had courted Miss Miller but stated that he regarded her as a sister.

Officer Earl Dunn denied that he smeared the plaintiff in error with blood and both this officer and the chief of police of Lake Forest denied that they beat or struck him or knocked him down. Officer John Dunn admitted that

he slapped the plaintiff in error three times when he became unruly at the police station, but denied that he was handcuffed at the time. Both officers and the chief of police denied that any person beat or struck the plaintiff in error or knocked him down in their presence. Neither these officers nor the assistant State's attorney who questioned the plaintiff in error shortly before two o'clock in the morning of May 8, and the sheriff who accompanied him to Lake Forest in the forenoon of that day observed any blood on his shirt or any indication upon his person that he had been struck, beaten or violently treated.

The first contention made by the plaintiff in error is that he was entitled to discharge from custody by authority of section 18 of division 13 of the Criminal Code, and that the circuit court erred in denying his motion for that purpose. The pertinent portion of that section (Cahill's Stat. 1927, p. 954; Smith's Stat. 1927, p. 1024), provides: "Any person committed for a criminal or supposed criminal offense, and not admitted to bail, and not tried at some term of the court having jurisdiction of the offense commencing within four months of the date of commitment, or if there is no term commencing within that time, then at or before the first term commencing after said four months, shall be set at liberty by the court, unless the delay shall happen on the application of the prisoner, or unless the court is satisfied that due exertion has been made to procure the evidence on the part of the People, and that there is reasonable ground to believe that such evidence may be procured at the next term, in which case the court may continue the case to the next term." The regular terms of the circuit court of Lake county begin on the first Mondays of March, October and December. The plaintiff in error was committed on May 19, 1927, and hence there was no term of the court which had jurisdiction of the offense charged within four months of that date. The first term succeeding the commitment of the plaintiff in error was the October

term. A special term was convened on the second day of May, 1927, seventeen days before the plaintiff in error was committed, but the order by which the term was called expressly provided that no grand or petit jury should be summoned for it. Thereafter, on July 15, a petition was addressed to the circuit judge by the State's attorney stating that it had come to the latter's attention that certain township and county officers were accused of withholding public funds from their successors in office and of conspiracies to embezzle such funds and praying that a special grand jury might be called to consider the charges. A special grand jury was convened on the 20th day of July, and seven days later made its report that it had examined six cases, and returned true bills in four of them. No petit jurors were drawn for the special term. Section 8 of the act concerning jurors (Cahill's Stat. 1927, p. 1551; Smith's Stat. 1927, p. 1678), which prescribes the method of drawing petit jurors requires that it shall be done at least twenty days before the first day of any trial term of the court. Petit jurors must be drawn in accordance with the statute, and when the plaintiff in error was committed, none could be drawn for the special term. The requirement of section 18 of division 13 of the Criminal Code is that a person committed for a criminal offense and not admitted to bail shall be tried at some term of the court commencing within four months of the date of his commitment or if no term commences within that period then at or before the first term commencing after its expiration. A term which began before the commitment of the accused person is excluded from the computation of the period. (*Ochs* v. *People,* 124 Ill. 399; *Grady* v. *People,* 125 id. 122; *Gillespie* v. *People,* 176 id. 238). The plaintiff in error, however, argues that *People* v. *Grandstaff,* 324 Ill. 70, shows that his motion should have been granted. The case relied upon was tried in the criminal court of Cook county. A term of that court begins on the first Monday of each

month. The defendant was committed on May 29, 1925, and the case was called for trial on the 25th of November following. Before the trial was entered upon he made a motion to be discharged from custody. More than five months and five terms of court intervened between his commitment and trial, and he was not responsible for the delay. Section 18 of division 13 of the Criminal Code clearly required the court to set him at liberty. The facts of that case are readily distinguishable from the facts of this case. By the express terms of the statute, the trial of the plaintiff in error was not required before the October term, and he was tried and convicted at that term. The motion for his discharge from custody was therefore properly denied.

Complaint is made that the State's attorney, by ascribing the murder to an assault upon the victim inflamed the minds of the jurors against the plaintiff in error. There was no pretense that a robbery had been attempted or consummated, and Miss Miller's position at the foot of the staircase, her disarranged clothing and the gag to prevent outcry afforded a basis for the inference drawn in the argument. It may be further observed that no objection to the argument was interposed, and hence that the contention now made is not available to the plaintiff in error. He argues, however, that such objections will be considered in capital cases without being preserved and that the instant case is one of that character. The rule was announced with respect to erroneous or inapplicable instructions in *Falk* v. *People,* 42 Ill. 331, in which the death sentence had been imposed. Obviously, the rule cannot be invoked in this case.

The plaintiff in error further contends that the circuit court erred in denying his motion for a new trial, based, as he asserted, upon newly discovered evidence material to his defense, which had been suppressed and withheld by the State. This evidence consisted of the electric railroad ticket and the cash fare receipt which the conductor gave

the plaintiff in error on his return from Fort Sheridan to Lake Forest to get the keys which he had forgotten. The ticket and the receipt, among other things, were taken from him at the time of his arrest, and the ticket and a pocket-book were returned to him after the jury retired. It is stated in an affidavit filed in support of the motion, that the evidence,—referring apparently to the ticket and the receipt,—"may have been very valuable to the cause of the defendant and that their being withheld by the authorities injured him." During the cross-examination of one of the prosecution's witnesses, the attorney for the plaintiff in error asserted that the authorities had taken a shirt, coat, hat and necktie from the defendant and the attorney demanded their return. Nothing was said about the ticket and the receipt at the time, and no request for their production was made during the trial although the plaintiff in error must have known of their existence. The contention is not that the ticket or the receipt would show the particular hour when the trip to Fort Sheridan was made, but merely that they corroborated the testimony of the plaintiff in error and were inconsistent with the prosecution's theory of the case. Plaintiff in error testified that he quit work on the evening in question at 6:30 o'clock. He then walked to the business section of Lake Forest, bought a pair of shoes, returned to his place of abode, obtained the railroad ticket, bathed, shaved, dressed, walked to the interurban railway station nearly a mile distant and waited from ten to twenty minutes until he boarded a train bound for Fort Sheridan. Upon his own statement, the plaintiff in error could not have departed from the railroad station at Lake Forest before 7 P. M. For that reason proof of the possession of the ticket and the receipt would not establish the fact that the plaintiff in error was not in Donnelley's house between 6:30 and 6:45 P. M. on May 7. If the ticket and the receipt had been offered and admitted, they would have tended to prove an inconclusive fact in support of which

the plaintiff in error had testified. The evidence upon which the motion for a new trial was based was therefore cumulative, and not of an independent fact or circumstance controlling in character of which no evidence had been introduced by the plaintiff in error. In order to require the granting of a new trial upon evidence which is cumulative merely, it must be conclusive, necessarily leading to a change in the result of the trial. (*People* v. *Corder*, 306 Ill. 264; *People* v. *Colvin*, 294 id. 196; *Petefish, Skiles & Co.* v. *Watkins*, 124 id. 384). It follows that the court did not err in denying the motion for a new trial.

The evidence, it is contended, shows overwhelmingly that the plaintiff in error is innocent of the crime of which he was convicted. To support this contention, certain portions of the prosecution's evidence are scrutinized. It is argued as an unusual circumstance that the name of the plaintiff in error was not mentioned by Hairston until officer Earl Dunn had returned with him to Donnelley's house. Hairston testified that he stated at the police station when he first called there that Mrs. Ferry's chauffeur was in the house. He did not return to Donnelley's home with the officer, for each drove his own car, and obviously there was not the same opportunity to converse about the crime that there would have been if they had gone together.

If Hairston's testimony is true, it is singular, the plaintiff in error further argues, that, instead of giving Miss Miller prompt attention and seeking assistance by telephone, he drove to the police station. Hairston called Miss Miller by name when he first discovered her at the foot of the staircase and received no answer. It is wholly probable that he thought she was dead, and that he believed assistance in the apprehension of her assailant was his first duty. Moreover, according to his testimony, the plaintiff in error descended the stairway and was present in the house at the time. In such a situation, it might not have been the part of wisdom to use the telephone. While Hairston may

not have exercised the best judgment under the circumstances, he promptly reported to the police what he found and rendered them such assistance as he could. He was frank, confronted the plaintiff in error without hesitation and gave no indication that he feared any consequences that might result. The jury not only heard his testimony but observed his demeanor on the witness stand and it was the jury's province to determine the weight to be accorded to his testimony.

It is also argued that it was not shown that the necklace belonged to Miss Miller. The proof was merely that the necklace, among other articles, was found in the possession of the plaintiff in error, and there was no contention that Miss Miller owned it.

Acts and statements of the plaintiff in error, on the contrary, do not comport with his innocence of the crime charged against him. The handkerchief used as a gag, which his aunt, in the presence of several witnesses, stated was his, tended to show his presence at the scene of the crime. The route which he followed by taxicab to convey him from the railroad station to Mrs. Ferry's residence was much longer than was necessary. He denied that he had been acquainted with Miss Miller. Two witnesses had seen the ring found in his pocket, or one exactly like it, in her possession. Even when the picture which he had taken showing her standing alongside Mrs. Ferry's automobile was first exhibited to him, he persisted in his denial. Later he admitted his acquaintance with her. The reason he gave for his denial was that the officers had beaten him. Apart from the admission by officer John Dunn that he slapped the plaintiff in error three times at the police station when he was unruly, the resort to physical violence was denied by every person concerned in the arrest and detention of the plaintiff in error. There was neither physical evidence nor the testimony of a witness to corroborate his accusation.

To accept the testimony of the plaintiff in error as true in its entirety, the testimony of several witnesses, apparently reputable and disinterested, must be ignored. No justification for such a course appears. The facts and circumstances shown by the evidence justified the jury in returning a verdict finding the plaintiff in error guilty.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*