(No. 26836.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANK GRADY, Plaintiff in Error.

*Opinion filed November 18, 1942.*

CHARLES J. JENKINS, and AARON H. PAYNE, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and THOMAS J. COURTNEY, State's Attorney, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, ALEXANDER J. NAPOLI, and EDMUND H. GRANT, of counsel,) for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

The defendant, Frank Grady, was indicted in the criminal court of Cook county for the murder of Allen Green. A jury found him guilty and fixed his punishment at fourteen years' imprisonment in the penitentiary. Motions for a new trial and in arrest of judgment were overruled, and judgment entered on the verdict. Defendant prosecutes this writ of error.

The homicide occurred shortly before 2:00 A.M., January 28, 1942. Defendant and a companion, Maxine Glass, had been drinking in the Subway Lounge, 3524 Indiana avenue, Chicago. A dispute arose between them which was resumed on the sidewalk in front of a public garage located a few doors north of the tavern. Green was shot by defendant when he intervened on Maxine's behalf. De-

fendant admits firing the fatal shots, but insists that he acted in self-defense. He testified that he was thirty-eight years of age, resided with his mother and stepfather at 131 East Thirty-fifth street, Chicago, and had been an employee of a packing company for eighteen years; that until 11:00 o'clock, P. M., January 27, 1942, he attended a "Wings over Jordan" program in the Du Sable High School auditorium; that while there he met Maxine Glass, and they repaired to the Piccadilly tavern, 3652 Indiana avenue, where they had some drinks. The bartender returned to defendant a revolver previously borrowed from him. Defendant further testified that about 12:30 or 12:45 A. M. he decided to leave; that Maxine demurred and he departed without her; that on his way home he stopped at the Subway Lounge, one and a half blocks north of the Piccadilly tavern and on the same side of the street, and found Maxine seated at the bar; that when he refused a drink tendered by the bartender, at Maxine's request, she reproached him for drinking with others and not with her. An argument ensued and he slapped her or shoved her away. Maxine's testimony differs from that of defendant in that she testified she first saw defendant in the Subway Lounge. She testified that she had paid her bill and was preparing to leave when he asked her if she were ready; that she said "yes," and that he slapped her and knocked her off the stool; that she was rendered unconscious and, when revived, she learned that defendant had left the tavern and followed him. The homicide arose out of the events which subsequently transpired.

Odessa Farley, nineteen years old, lived at 3505 Indiana avenue. She testified that about 2:00 A. M., on January 28, she was awakened by an argument between defendant and Maxine in front of a public garage located across the street; that she heard the woman asking defendant to stop hitting her; that Maxine fell, and while defendant was assisting her to her feet and restoring the

contents of her purse, she, the witness, saw a man in a
green coat (identified as Allen Green) coming down the
street. According to Odessa Farley, Green stopped and
helped defendant pick Maxine up; that she asked for some-
one to take her home; that defendant suggested a cab and
also said to deceased, "What have you to do with it?;"
that Green was carrying a package which he set down on
the sidewalk, and that defendant backed up with a gun
and shot at Green five or six times in rapid succession. The
witness testified further that when she next saw Green he
came from a vacant lot south of the garage, picked up his
package and ran northeast across Indiana avenue. She
added that Green did not fire any shots.

Eleanor Scott, a housewife living at 3515 Indiana ave-
nue, testified that her windows on the third floor were
directly across from the garage; that her attention was
attracted by loud talking on the street by defendant and
a woman; that they were swearing at each other, and that
defendant slapped the woman; that when Green appeared
on the scene he asked defendant, "Why don't you let her
alone?;" that defendant then uttered some vile names;
that Green said, "I don't call nobody names like that and
I don't take them;" that defendant told him he would take
it because he was meddling; that defendant and Green
were close to the garage entrance door; that thereupon de-
fendant, who was standing north, facing south, fired more
than four shots at Green, who was standing south, facing
north, and that Green then went onto a vacant lot and
defendant came around a parked car and walked south;
that thereafter Green hurriedly came across the vacant lot,
picked up his package and crossed to the east side of the
street out of her range of vision. In answer to the ques-
tion, "Do you know whether the man in the green over-
coat, the man that had the package, * * * fired any
shots there or not?" the witness replied, "I did not see
him fire any," and "All the shots that I saw fired was from

the one that was north. The light from the revolver was from the north shooting southeast."

John Morgan, a masseur, living at 601 East Thirty-sixth street, testified that after Green appeared he heard defendant and Green arguing, and went into the rear of his place; that he heard about six or seven shots fired, with no intervals between them.

William Gamble testified he was employed at the United Garage, 3504 Indiana avenue, on the night in question; that he did not hear anything unusual until the firing of the shots; that they were too numerous and too rapid to count; that after the shooting he observed blood on the sidewalk and a gun lying back of a stone, and that he turned the gun over to police officers who appeared at this juncture.

Green's employer, Harold Marcus, owner of a liquor store at 217 East Thirty-fifth street, testified Green occasionally made deliveries, and that about 1:45 A. M. on January 28, in response to a telephone request for a half gallon of beer, Green left to make the delivery, and that he next saw Green about fifteen minutes later when the night watchman opened the door and Green fell forward. He was carrying the half-gallon bottle which broke when he fell.

Sergeant John Wall testified he examined People's exhibit 1, the gun identified as Green's, and that he broke the gun open and found two empty shells and four cartridges.

An autopsy made on January 28, 1942, revealed there were three bullet wounds in the following regions: "No. 1: right arm at bicep muscles; No. 2: right upper abdomen just below costal margin; No. 3: through and through of right upper chest."

Defendant testified that when Maxine caught up with him on the sidewalk after leaving the Subway Lounge, he told her he had had enough to drink and had to be at work early the next morning; that they walked north a short distance seeking a cab in which to send Maxine home, but that none was available. Cleon Jackson, a taxicab driver

and defense witness, testified that his cab, at the time, was parked on Indiana avenue, directly across from the Subway Lounge. Defendant further testified he and Maxine had walked north a short distance when they stopped; that she persisted in arguing, then scratched him and he slapped her; that she fell and he picked her up; that he attempted to quiet her because he did not want to create a scene; that thereupon Green approached from a direction unknown to him, saying "What goes on here?;" that he told Green, "It's only a lady friend; I can take care of her;" that Green then said, "Put up your hands;" that he saw a gun in Green's right hand; that at this moment two shots were fired, and that he, defendant, then pulled his gun from his right hand overcoat pocket and fired in return. In answer to the question, "Why did you pull your gun?" defendant answered, "Well I was afraid that he would shoot me. He was shooting at me. In fear of my life I shot the man in self-defense." He also stated he "thought it was a stick-up." Defendant declared he had never seen Green before. According to cab-driver Jackson's testimony he heard someone down the street say: "What goes on here, put them up." Jackson did not say whom he heard make the statement. Green, however, was employed on Thirty-fifth street, just around the corner from the shooting, and was carrying a half-gallon bottle of beer which he was delivering to one of his employer's customers, in a neighborhood where presumably he was well known and readily subject to identification. It is scarcely plausible that Green would have selected this vicinity for a holdup. Also, it was stipulated that the Chicago Police Department previously had issued to Green a permit, the renewal of which had expired July 21, 1941, entitling him to wear a "Special Police" badge and to carry a gun on his employer's premises.

Defendant identified exhibits 1 and 2, his coat and overcoat, as the garments worn on the night of the shooting, and pointed out three holes described as running "in

a slightly downward position, beginning the second button on the overcoat." This evidence is subject to scrutiny, when it is considered that the holes, inferentially, are asserted to have resulted from bullets fired from Green's gun. It is incomprehensible that defendant should have been shot through his coat and overcoat as described and not been injured. The jury evidently was not impressed by the related story. He further testified that after the shooting he walked around an automobile looking for a policeman; that he saw a squad car at Thirty-fifth street, walked over and told the police he had been in a shooting; that he did not know whether he had shot the man; that he had his gun with the cartridges removed; that he informed the police Maxine Glass was with him and gave her address, and that together they picked her up at her home, after which he and Maxine were taken to the station, where he noticed the bullet holes in his clothes and called the attention of officer Harness to them the next morning. On cross-examination, defendant further testified that when he drew his gun after Green had fired the two shots, he thought Green had four possible shots remaining in his gun.

Officer John Thomas, assigned to a squad car on the morning of January 28, corroborated defendant's narration of the foregoing report to the police. The testimony discloses that defendant had known officer Thomas for ten or eleven years, and it is significant that upon defendant identifying Green as his victim, instead of being taken directly to the station and held incommunicado, as would be expected under the circumstances, Maxine was picked up and allowed to ride in the back seat with defendant.

Maxine Glass, called as a court witness, testified that she was married and living with her husband; that she had known defendant four or five years, having met him once or twice each month, usually in taverns; that she followed defendant out of the Subway Lounge and when she caught up with him she asked why he had hit her, and

that he struck her again; that after she was knocked down, a man walked up to them; that defendant admonished him three times, "Go ahead, let us alone, I will take care of her;" that the next thing she knew this other man had fired two shots, and that she arose and ran into a garage. Maxine further testified that she did not hear the man say anything to defendant, and did not know how long the man was present before the shots were fired; that she did not observe whether he had a package; that she did not remember whether the man assisted her; that she heard more than two shots, but did not know how many shots she heard on the second occasion, and that she did see a gun in the other man's hand.

Cleon Jackson, previously mentioned, testified that when he turned around from his cab he first saw two flashes from a gun which came from the south, "and then there was a whole lot more flashes" from the opposite direction, and that he jumped in his cab and drove away.

Defendant's mother and four witnesses testified as to defendant's good reputation as a law-abiding citizen in his community.

It is contended that certain instructions, defining murder, malice and malice aforethought were erroneous because they ignored the theory of self-defense. The instructions complained of correctly set forth the law pertaining to the particular subjects, and none of them directed a verdict. They must be considered with reference to other instructions given on the subject of self-defense, and, when read as a series, fully and fairly announce the law applicable to the theories of the People and of the defendant, respectively. When so considered, they neither ignore nor nullify the theory of self-defense. *People* v. *Moriarity*, 380 Ill. 148; *People* v. *DeRosa*, 378 id. 557.

Other instructions on self-defense are claimed to be erroneous for reasons set forth in *People* v. *Clark*, 368 Ill. 183, and *People* v. *Duncan*, 315 Ill. 106. The type of in-

struction criticized in the *Clark case* and other cited cases told the jury that whether the plea of self-defense was justifiable depended upon whether it believed, from the evidence, that self-defense was necessary or apparently necessary in order to save the accused's life or to prevent him from receiving great bodily harm. In the instruction condemned in *People* v. *Duncan, supra,* the jury was told "It must appear from the evidence that at the time of said killing the defendant was in such apparent danger that a *reasonable* person under the same circumstances would have been induced to believe, * * * ." In the instructions here complained of the jury was required to determine what the *defendant,* as a reasonable man, believed, and no error was committed in giving them.

Defendant complains of instruction No. 22 given on behalf of the People. This instruction informed the jury that evidence in regard to defendant's general reputation for being a peaceable and law-abiding citizen was admissible and was to be regarded as a circumstance in the case, but if the jury found from all the evidence in the case beyond a reasonable doubt that the defendant was guilty, then it was its duty to find him guilty notwithstanding the fact that he had borne a good reputation. This instruction was proper. In the case of *People* v. *Biella,* 374 Ill. 87, relied upon by defendant, the jury was told that good reputation was not sufficient to justify acquittal if the jury was convinced beyond all reasonable doubt from "all the evidence of the guilt of the accused." That instruction was erroneous because it limited the jury to a consideration of all the evidence of the guilt, thus eliminating evidence tending to show his innocence.

It is next contended that the court erred in allowing People's exhibit No. 3 to go to the jury room notwithstanding it had not been admitted in evidence. This exhibit, "Chicago Special Police Patrolman" badge attached to the holster of Green's gun, was offered in evidence by

the People, and its admission was denied. There is nothing in the record to indicate that it did go to the jury room with the admitted exhibits.

Defendant contends further that error was committed in not granting him a new trial on the ground of newly discovered evidence. The affidavit of police-officer Andrew Meade, dated April 9, 1942, about three weeks after the trial, stated that about 2:00 A. M. January 28, he obtained deceased's gun from William Gamble, and that "your affiant examined this revolver and found two (2) thirty-eight (38) caliber shells fired therefrom. Your affiant further states, from his long experience with firearms, he determined upon examination that the said revolver had been recently fired." Meade was one of three police officers who, on January 28, 1942, signed a report to the chief of police of Chicago of the shooting. It is significant that nothing is contained in his report of January 28, regarding the examination and purported recent firing of Green's gun. Apart from the fact that defendant not only had ample time prior to the trial to find officer Meade, the substance of the affidavit in support of the motion for a new trial consisted of cumulative matter, defendant and others having testified that he was fired upon twice by the deceased. The established rule is that a new trial will only be granted for newly discovered evidence where it is shown that it could not have been produced on the trial by the use of reasonable diligence, and if the evidence is cumulative in character it must be conclusive, necessarily leading to a change in the result. *People* v. *Pueschell,* 337 Ill. 84; *People* v. *Colvin,* 294 id. 196.

The final contention requiring consideration is that the evidence does not prove defendant guilty beyond a reasonable doubt. It is argued that the undisputed facts show the deceased was the aggressor and that defendant, in self-defense, fired the six cartridges contained in his revolver in rapid succession; that the deceased sustained three

wounds, one of which was through the right arm biceps muscles, causing him to drop his gun, and that, therefore, the two bullet's fired from Green's gun necessarily were fired first, because had defendant fired first the wound in the biceps muscles of the right arm of the deceased would have incapacitated deceased from firing at all, and no bullet holes would have been found in defendant's coats. This contention and the supporting argument ignore the important fact that two of the People's witnesses, Odessa Farley and Eleanor Scott, eyewitnesses to the shooting, both of whom lived directly across the street from the scene and who were in a position to see what happened, testified that their attention was attracted by the noise incident to the argument between defendant and Maxine and that they did not see deceased fire any shots at defendant. They were both disinterested witnesses whose testimony was material and pertained to the events occurring from the time their attention was called to the argument until the actual shooting. Their version of what happened is directly contrary to that of the defense eyewitnesses, Maxine Glass, Cleon Jackson and the defendant himself, on the very material question whether defendant or Green fired the first shot. A factual conflict was thus presented as to whether defendant or deceased was the aggressor, and also whether defendant fired in self-defense, as claimed. Defendant had a fair trial. The jurors saw and heard the witnesses testify and it was for them to determine, under proper instructions of the court, the issues of fact presented thereby, as well as the credibility of the witnesses and the weight to be accorded to their testimony. We cannot say that the verdict finding defendant guilty of murder, as charged, is not justified by the evidence.

The judgment of the criminal court is affirmed.

*Judgment affirmed.*