NOTICE
Decision filed 09/19/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230036-U

NO. 5-23-0036

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 22-CF-247 |
| | ) | |
| JIMARIA F. WILEY, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Barberis and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held:*  Defendant's conviction is reversed where the State failed to disprove defendant's self-defense claim.

¶ 2    Defendant, Jimaria Wiley, files a direct appeal from her conviction for aggravated battery and sentence of 24 months' probation. On appeal, she contends that (1) the State failed to prove beyond a reasonable doubt that she was not acting in self-defense, (2) the trial court erred by giving an "initial aggressor" jury instruction, (3) the trial court erred by restricting the jury to a single viewing of the video evidence, (4) the prosecutor committed misconduct by voicing his personal opinion and misstating the evidence and the law, and (5) her trial counsel was ineffective for failing to object to the jury instructions, the prosecutor's alleged misconduct, and the court's limitation of the jury's review of the video evidence. For the following reasons, we reverse.

1

¶ 3                                    I. BACKGROUND

¶ 4      On March 2, 2022, defendant was charged, by information, with one count of aggravated battery (720 ILCS 5/12-3.05 (West 2020)) and one count of aggravated domestic battery (*id.* § 12-3.3). The information alleged that on March 1, 2022, defendant caused great bodily harm to Lavell Fleming, a family or household member of defendant, in that defendant stabbed Lavell.

¶ 5      Defendant's trial began on November 8, 2022. The parties provided opening statements, at which time the State laid out its proposed evidence and defense counsel argued that the case was about self-defense.

¶ 6      The State's presentation of evidence started with the testimony of Officer Jonathan Kristenson. Officer Kristenson testified that he worked for the Champaign Police Department and he, along with other officers, responded to the Ulta Beauty parking lot located on North Prospect in Champaign, Illinois, on March 1, 2022. He explained that Ulta Beauty was part of a strip mall with an open parking lot. He spoke with defendant after she left the scene and noted she had blood on the back of her shirt. He stated that defendant admitted being involved in an incident and injuring somebody. Officer Kristenson also made contact with the victim, Lavell, who had blood on his right side from two stab wounds, one on his lower right back and the other near his right buttocks. Officer Kristenson stated that defendant was detained.

¶ 7      After investigating the incident, Officer Kristenson determined the incident arose from a Facebook post which led to a confrontation at the Ulta Beauty store involving a group of people and one of the Ulta Beauty employees. Officer Kristenson stated that defendant told him that she went to the store to confront the group of people confronting the Ulta Beauty employee. Two of the people in the group were Lavell Fleming, and his mother, Rona Wiley-Hillsman. When defendant arrived, there was a verbal altercation between defendant and Rona; Lavell tried to

2

separate them. At that time, defendant had a folded-shut knife and a cell phone in her hands. Defendant stated that after the initial verbal confrontation, and believing that defendant had a boxcutter, Rona went to her vehicle and retrieved a machete. Defendant and Rona entered into a verbal altercation with each woman holding her respective weapon. Rona eventually ran up to defendant and slapped her in the face. Lavell tried to keep the women separated, grabbed defendant, and picked her up. Defendant then stabbed Lavell. Lavell threw defendant to the ground and got on top of her, and defendant stabbed Lavell a second time. The officer stated that defendant told him that she stabbed Lavell in self-defense. He stated the only other person with a weapon was Rona, who had a machete. The officer was unaware of Lavell threatening defendant or attacking defendant. He stated that he did not observe any injuries to the defendant but did see blood on her clothing which he presumed was Lavell's since the officer was unaware of anyone else at the scene being injured. Officer Kristenson's body camera footage was identified and admitted without objection. The State advised that it was not planning on publishing the video unless it was necessary.

¶ 8    On cross-examination, Officer Kristenson agreed defendant told him that she was on her way to the police department when she saw the police and came back to the scene to talk to the police. He also agreed that defendant told him that she had injured someone in self-defense. The officer stated that a female named Morgan drove defendant in defendant's car to Ulta Beauty. He agreed that defendant went to Ulta Beauty to stop Rona from confronting Coretha Ford, who was an Ulta Beauty employee.

¶ 9    Officer Kristenson agreed that defendant told him that she had issues with Rona in the past. He further agreed that defendant and Rona had a verbal altercation in the parking lot. He testified that defendant told him that Rona came up to her, flicked her on her nose a couple of times, and

slapped her face, and that Lavell, who was Rona's son, tried to separate them. Defendant told the officer that she was afraid of Lavell from incidents in the past and that when he grabbed her, he picked her up and took her to the ground, she felt that she was defending herself and admitted stabbing Lavell. The officer did not recall seeing the incident video taken by a witness. When the officer went back to check on defendant, he was checking to see if she had any injuries. He did not recall seeing any scrapes on defendant's hand or taking pictures of any injuries on defendant.

¶ 10    On redirect, Officer Kristenson stated that that he looked but did not find any complaints made by defendant about Lavell. On cross-examination, the officer confirmed that he was looking for police reports filed in the ARMS database and agreed he did not look to see if any calls for assistance were made by defendant.

¶ 11    Following Officer Kristenson's testimony, two stipulations were read to the jury. The first stipulation involved the collection of evidence and stated that on March 1, 2022, Officer Brian Greear responded to the scene of a stabbing outside Ulta Beauty. He collected the knife and machete found at the scene and placed them into evidence. The stipulation agreed to the admission of People's Exhibit Nos. 1 (the knife) and 2 (the machete). The second stipulation involved a cell phone video. The stipulation stated that Officer Danielle Griffet responded to the scene of the stabbing and spoke with witness, Zachary Clark, who stated that he tried to record the incident on his phone, and it appeared that Lavell was trying to separate the females. The video was placed into evidence by Officer Griffet. The stipulation further stated that the video did not depict the entire altercation and there was no objection to the admission of People's Exhibit No. 3 (the cell phone video).

¶ 12    Following the court's reading of the stipulations, the State published People's Exhibit Nos. 1 and 2 to the jury. Thereafter, the State played the cell phone video. Our review of the video,

4

revealed the following: The video is blurry at the beginning but when the focus clears it shows Lavell with his arms around defendant's arms and torso while pushing defendant into the hood of her car. Lavell then turns while continuing to hold defendant's arms and torso, raises defendant into the air, pushes her into the pavement, and climbs on top of her. A woman yells "hold her down." A second voice screams, "Get him off me" at least four times. Lavell and defendant are surrounded by two other people and defendant's legs are flailing while she is being held on the ground. The other two people lean into Lavell while he is lying on defendant. Rona—while holding a machete—comes over to where Lavell is holding defendant on the ground. Rona proceeds to repeatedly strike defendant in the head with her hands. Rona picks the machete off the ground. A bystander, Scott Stromley, takes the machete from Rona and walks away from the scene. Lavell and defendant eventually stand up. Lavell pulls up his shorts and defendant runs to her car, turns toward Lavell and Rona with her arms in front of her face, and turns back toward her car. Lavell lays back down on the ground. Once defendant is in her car, Rona pummels the driver's side of defendant's car.

¶ 13     Lavell testified that he was 23 years old and worked at Tire Barn. He stated that defendant, who was an ex-girlfriend, stabbed him twice on March 1, 2022, once in the hip and once in the right butt cheek. Lavell stated that he went to Ulta Beauty on that date to keep his mother, Rona, "from getting into an altercation with another person" who worked at Ulta Beauty. He was there with his girlfriend, Ivory, who was pregnant at the time. When Lavell got to the store, his mother was already in the store, so he proceeded into the store. There was no physical altercation in the store, only a verbal altercation. Rona left the store with Lavell and Ivory, and defendant showed up with Lavell's "first baby mama," Morgan. Two children, aged two and four years old, were also in defendant's car. The two-year-old child was Lavell and Morgan's child.

¶ 14    Lavell testified that defendant started talking to Rona as he walked past them and it "got heated pretty fast." Defendant was telling Rona that she should not be bringing up issues to the employee's place of business. They were chest to chest yelling. Lavell turned around and walked back to separate them. He got them separated and defendant returned to her car. Lavell and Rona successfully retrieved Lavell's child out of defendant's car while defendant sat in the passenger seat. Lavell stated that when defendant walked back to the vehicle, defendant picked up a knife. He stated that the second altercation between Rona and defendant occurred after the child was removed from the car. It started with yelling but then Lavell saw Rona obtain her machete from the vehicle. Defendant and Rona then engaged in another verbal altercation. They were again chest to chest. Lavell put his body in between his mother and defendant. He was worried someone would get hurt badly because one person had a knife and the other had a machete. He was concerned about everyone's safety. When he got in between his mother and defendant the second time, Lavell heard defendant's knife click open. He clarified that the knife was not open before then. He then turned around and attempted to bear hug defendant "to subdue her before someone got hurt." He started by holding her from the front then rotated. He had defendant's knife hand "stuck at first" but then it was in the air. When he tried to bear hug defendant, he caught one arm but missed the other. After defendant stabbed him, he "[t]ook her to the ground" and got stabbed a second time. He was eventually taken to the hospital and his wounds were treated. One wound was declared a "self-heal" and the one on his butt cheek received skin glue as the treatment. Pictures taken of his injuries were published to the jury.

¶ 15    Lavell stated that he never verbally threatened defendant at the scene and had no weapons. He did not try to punch, kick, bite, scratch, or slap her. He stated that after he took defendant down, he separated from her, saw her get in her car, and try to leave.

¶ 16    On cross-examination, Lavell stated that he was between 5'9" and 5'10" and weighed 195 pounds at the time of the incident. He agreed that he briefly dated defendant in the past. He stated that Morgan was the mother of his first child, and Morgan arrived with defendant. He agreed that his mother was at Ulta Beauty to confront Coretha Ford. When he got into the store his mother was yelling at the manager wanting to speak with Coretha. He knew his mother was at Ulta Beauty because his mother called and told him about the Facebook post. He did not know if Morgan was the one who actually made the post, and he never saw the Facebook post but agreed that the Facebook post was about Morgan and had nothing to do with his mother.

¶ 17    Lavell agreed that defendant told his mother that she should not have brought the Facebook post up to where Coretha worked. He did not hear his mother respond that she was 40-some years old and defendant was not going to tell her what she could or could not do. He said he had walked away and was going to talk to Morgan. He only turned around because defendant and Rona got louder. Lavell stated that he was trying to get everyone to leave the area. He saw his mother get the machete and stated he did not try to take it away from her because "as her child I know not to touch her hand." He explained this by saying this had to do with "her past." Lavell confirmed that he did not feel safe removing the machete from Rona's hand. He felt safer staying in between his mother and defendant.

¶ 18    Lavell stated that he felt the need to forcefully pick up defendant in the air and slam her to the ground. He further stated that he did not feel like his mother was the threat; defendant was the threat. He said that his mother only retrieved the machete as self-defense. He agreed defendant's knife was not open in her hand when his mother got the machete from her vehicle or when Rona returned carrying the machete. He said that defendant was letting everyone know that she had the knife and kept showing it. He agreed the entire blade of the machete was showing the whole time.

7

¶ 19    On redirect, Lavell stated that the Facebook post was between Morgan and Coretha and did not have anything to do with his mother. From what Lavell was told, it was a lie put on Facebook, his mother "chimed in on it," and Coretha said something towards Lavell's mother, which was why his mother confronted Coretha at Ulta. He agreed the Facebook post had nothing to do with defendant either.

¶ 20    Rona Wiley-Hillsman testified that she was Lavell's mother. She was 47 years old and worked as a tour bus driver for Peoria Charter. She agreed that she went to Ulta to confront one of its employees about a Facebook post. She said that she and defendant arrived within a few minutes of each other. She went into the store and, at some point, her son arrived. She stated that the situation inside Ulta was defused, and she left the store with Lavell. She was then confronted by defendant in the parking lot. Rona knew defendant because she had previously dated Lavell.

¶ 21    Rona stated that defendant was running towards her in the parking lot and defendant was mad because Rona went to Ulta to confront the employee. She agreed that a verbal altercation ensued between her and defendant and that Lavell was present during the altercation. She stated that Lavell tried to intervene by stepping in between her and defendant. Lavell separated them and then headed for defendant's car to get his daughter. After Lavell's child was retrieved, Rona noticed that defendant had a knife in her hand which prompted Rona to get her machete out of her truck. She said the two vehicles were about 10 feet away from each other. Rona identified the machete as People's Exhibit No. 2. She explained that she had the machete for protection because she was a female who left work at night and had to park away from her employer's building.

¶ 22    Rona confirmed that after she saw that defendant had a knife, she got her machete. She stated that defendant put the knife back in her car and she returned the machete to the truck. There was a reengagement of the verbal altercation and defendant pulled the knife back out of her car.

8

Rona stated the blade was open when defendant removed it from the car. Lavell again tried to separate the women and tried to take the knife from defendant. She stated that Lavell grabbed defendant from behind while she had the knife in her hand. Rona stated that Lavell used a wrestling move and grabbed at defendant's arms. Rona stated Lavell was trying to grab defendant's arm before she came down and stabbed him the first time. Lavell then put his leg around defendant and tripped her down to the street and defendant stabbed Lavell a second time. While that was happening, Rona returned to her vehicle to retrieve her machete. When she returned, Lavell and defendant were on the ground. Rona stated that she threw the machete and grabbed defendant at the top of her head and started punching defendant in the face to make her release the knife. She was successful and a man came and got the knife out of defendant's hand. Rona was able to separate defendant and Lavell with the help of others. Rona stated that she grabbed the machete the second time because she was concerned about her own safety as well as that of her family. She never heard Lavell threaten defendant, saw him with any weapon, or saw him try to punch, kick, slap, bite, or spit on defendant other than when he was trying to separate Rona from defendant. Rona agreed that her altercation with defendant became physical, and she put her hands on defendant prior to Lavell being stabbed. She stated that defendant was pointing her fingers at Rona and Rona told her that was "not what you want to do" but when defendant continued, Rona "smacked her." That was before defendant got her knife. She stated that defendant's behavior became a little more aggressive because she pulled the knife out of her car. After defendant and Lavell were pulled apart, she saw defendant get back into her car. Defendant closed the door, rolled up the window, and started to drive away. Rona stated that she and Ivory tried to stop defendant from leaving but they were unsuccessful.

9

¶ 23 On cross-examination, Rona agreed that tensions were high and there was a lot of screaming and yelling in the parking lot. She stated that the Facebook post consisted of Morgan and Coretha going back and forth about a comment about a child. Rona agreed that having defendant yell at her and point her finger at her did not sit well with her and she did not like anybody yelling at her or pointing their finger. She agreed that she took it upon herself to go to a business for a woman she did not know to confront her about a Facebook post that had nothing to do with her. She agreed that she got the machete out of her vehicle when defendant pulled her knife out. Rona stated that she did not get in her car to just drive away because defendant could have gotten out of her car and stabbed Rona in the back. She stated that she did not have the machete when Lavell threw defendant on the ground. She stated that she punched defendant in the face because defendant stabbed Lavell. She agreed that she did not call police either time she saw defendant with the knife.

¶ 24 On redirect, Rona agreed that her grandchild was removed from the car. She further agreed that defendant was in the car when her grandchild was removed and stated defendant could have driven away too.

¶ 25 Scott Stromley is a 28-year-old video gaming repair technician who was at PetSmart on the day of the incident. He saw the younger female and an older female in a verbal altercation and then a male was in the middle of them. He said the younger female had a knife in her hands. He opined that the male was trying to break the whole thing up. He did not see any weapons in the male's hands or that the male was acting in an aggressive manner toward anyone. He said that after the knife was brought out, the male bear-hugged the girl and took her to the ground. Scott walked over and grabbed the knife out of the young girl's hand. The other female then handed him a machete. He stated that after the incident, the male was bleeding and the girl got into her car.

10

¶ 26    On cross-examination, Scott could not recall if defendant's knife was open or not. Nor could he recall whether the woman with the machete was actively punching the other girl.

¶ 27    Courtney Chancellor is a teacher at Franklin Middle School who was headed to Ulta Beauty on the same day as the incident involving defendant. She parked in the parking lot and heard an argument start behind her. She saw a shorter woman and a tall, skinny younger woman arguing. Courtney stated there was a lot of cussing and loud voices, so she stayed in her car because she was concerned there would be trouble. She did not see anything physical until the argument moved closer to a car. Courtney testified that she heard a man say, "my mom's crazy, stay away." She thought it sounded like he was trying to break up the verbal altercation. She saw the male wrap his arms around the skinny girl's waist and try to pull her away. She did not see him with any weapons and opined that the male was not aggressive. Courtney stated that he was almost pleading for the girl to stay away from his crazy mother.

¶ 28    On cross-examination, Courtney stated that the older woman was yelling at the other girl telling her she could not tell her what to do. The male was also telling his mother to stop. She did not see the male throw the skinny girl to the ground. She did not see anybody with any weapons.

¶ 29    Following Courtney's testimony, the State rested. Defense counsel moved for a directed verdict, which was denied.

¶ 30    Defendant testified that she was 20 years old, 5'5", and weighed 135 pounds on the day of the incident. She identified photographs taken of her injuries following the incident. The injuries included a scratch next to her right eye, a bruise on the right side of her forehead, scratches on her left knuckle, scratches on her left and right wrists, a swollen and bruised knee, a scrape on her elbow, and back pain for a couple of weeks. The photographs were admitted without objection and published to the jury. Defendant stated that Coretha Ford was her friend, and she often babysat

11

Coretha's four-year-old child who was in her car on the day of the incident. Defendant stated that Morgan Ake was previously her best friend, and she would also babysit for Morgan and Lavell's child who was the two-year-old child in the car. She, Morgan, and the children took Coretha to work around 2 p.m. They headed to Morgan's house to hang out. As they were getting ready to leave, Morgan became upset because Coretha had not spoken to her while they were in the car. Morgan stopped the car and went on Facebook live and talked about how disrespectful it was that Coretha had not spoken to her after giving her a ride to work. Thereafter, Rona started commenting and using emojis and asked who the comments were about. In the comments, Morgan explained who it was, and Coretha saw the post and started commenting as well. Thereafter, Rona and Coretha kept posting. Morgan asked defendant to post on Facebook as well, but defendant refused.

¶ 31    Morgan then told defendant that Rona was going up to Ulta. Defendant testified that she planned to drop off the children and Morgan at Morgan's house and later head to Ulta to speak with Coretha's manager to ensure Coretha did not get fired. She explained that she did not want Coretha to lose her job because she had a child. However, instead of Morgan driving to her own home, Morgan turned the car around and headed straight to Ulta. When they got to the parking lot, defendant saw Rona get out of her car and start walking toward the store. She then saw Lavell get out of a different car and start walking with his girlfriend to the same store. Morgan got on the phone and called Rona who answered her phone while screaming at the store manager. Morgan told defendant to speak with Rona on the phone. Defendant stated that she tried to speak with Rona, but Rona was belligerent, screamed at her, and would not listen. Therefore, defendant got out of her car and started walking toward Ulta so she could talk to Rona.

¶ 32    Defendant explained that Rona was asking her about claims that Morgan was being abusive to Coretha's child. When defendant stated she did not know anything about it, Rona just kept

12

screaming about it. She told Rona that she understood why Rona was upset but stated that the issues should not be taken to Coretha's job because Coretha needed the job to care for her child. Rona then got madder and told defendant she was her own person, with her own car, and could do whatever she wanted.

¶ 33    Defendant said that she tried to remain calm, but Rona started pushing her and pointing her fingers at her face. Rona then accused defendant of "shoulder-checking" Lavell and told defendant to do that to her. Defendant disputed Rona's statement, telling her that she was only 5'5" and Lavell was six feet tall. Rona kept telling defendant to do it to her. Defendant stated that she felt threatened and that Rona kept getting closer to her and kept pushing defendant with her chest.

¶ 34    At that point, Lavell walked over, and Rona asked him if defendant shoulder-checked him. He said that defendant "pushed my shoulder," so Rona kept coming after defendant. Defendant clarified that the shoulder-checking incident actually happened a week earlier. Defendant testified that as Rona kept coming after her, Lavell started pushing defendant really hard. He had his hands on her shoulders, told her to get out of Rona's face, and pushed defendant away from his mother. When asked about her previous relationship with Lavell, defendant stated that she and Lavell only dated for about a month from August to September in 2021. She got into a relationship with someone else but after that relationship ended, she contacted Lavell for comfort. They were together for a day but broke it off when Lavell found out his girlfriend was pregnant. However, defendant remained in contact with Morgan, who was the mother of Lavell's first child.

¶ 35    Defendant stated that Rona ran towards her when Rona left the store. The argument continued in the parking lot. After she walked away the first time, defendant saw Lavell's girlfriend, Ivory, in defendant's car, rummaging through bags. She asked Ivory what she was doing and told her to get away from the car. She stated that Lavell then ran over and into defendant

13

directly "like a football player" and told defendant not to talk to Ivory that way. Defendant picked up her phone and, with the knife and phone in the same hand, said she was going to call the police. As she pulled out her phone and unlocked it, Lavell stated, "I'm not scared of a boxcutter." Defendant asked Lavell what he was talking about and that was end of the discussion until Rona walked up.

¶ 36 Rona then asked defendant if she pulled a boxcutter on Lavell. Defendant said no, and Rona said, "one moment." Rona walked away, and defendant told Lavell to get his child and everything else out of her car and to get away from her. Rona pulled her vehicle right next to defendant's car. Rona got out of the vehicle and said, "you play with boxcutters, this is what I play with, B. I will kill you." Defendant explained that "B" was short for the word "bitch." Defendant stated that she "absolutely" felt threatened by Rona. Defendant turned back to her car to get Morgan's things out of the car so defendant could leave. She handed Morgan's phone out the driver's side window and that was when Rona walked over, flicked defendant's nose, and told her to get out of the car. Defendant said "no" and told Rona not to touch her. Defendant got out of the car and again told Rona not to touch her. Rona walked over, flicked defendant's nose again, and then Rona "backed up and she in like the fighting motion. And she [was] just bobbing back and forth," and she said, "I just touched you twice and you didn't do anything." Defendant said, "you didn't touch me, you flicked my nose." Rona then slapped defendant.

¶ 37 Defendant stated that Rona dropped the machete to the ground after she had flicked her twice and was not holding the machete when Rona slapped her. Defendant continued to hold the knife and phone in her hand, stating the blade was not exposed. As soon as Rona slapped defendant, Lavell stepped in between them, pushed defendant, grabbed her, and picked her up off the ground. Defendant started screaming and told Lavell to let her go. She stated that she was terrified when

14

Lavell grabbed her and thought he was going to hurt her. She opened the knife, and she stabbed Lavell so he would let her go but he held on and then slammed her on the ground. She tried to stab him again so he would let her go but he held her down by getting on top of her on the ground. Defendant stated that she did not remember getting hit in the face or being kicked. She stated that the only thing she remembered while she was on the ground was seeing Rona with the machete in her hand and Rona's hand with the machete going up in the air. She saw a man take the machete from Rona and felt him take the knife out of her hand. She heard someone say that Lavell was bleeding and she was finally able to roll him off of her, get up, and try to get away. She got to her car. The four-year-old child was still in the car. Rona was banging on the car's window and hood and telling defendant to get out of the car. Rona would not let defendant leave. When she finally saw an opening, defendant left and headed to the police station. She saw two police cars and an ambulance going in the opposite direction and figured they were headed to where the incident occurred, so she turned around and spoke to the first police officer she saw to report the incident. Defendant explained that she kept the phone and knife with her at all times and had both when she walked up to Rona as she was leaving Ulta. She stated it was in her hand the entire time.

¶ 38    On cross-examination, defendant stated that she saw the machete go up when she was on the ground. She agreed that no one else testified that the machete was raised but stated that it looked like it went up when she was on the ground. She also agreed that everything she told the officer was on the body camera. She disagreed that she told the officer that Lavell came at her like a football player. She also believed that she told Officer Kristenson that someone threatened to kill her. She agreed that she did not post anything on Facebook and interjected herself into the situation when Rona was leaving the store. She also agreed that when she got out of the car, and initially confronted Rona, that she had a knife in her hand. She further agreed that once Lavell separated

15

her from Rona, she could have gone back to her car and left the area, or she could have called the police. She agreed that Lavell tried to separate her and Rona twice; the first time was when she went to her car and the second time when she had a knife and Rona had a machete. She further agreed that she told Officer Kristenson that Rona ran up to her and she wanted to run up to Rona but did not get the chance because Lavell grabbed her.

¶ 39     Following defendant's testimony, the defense rested. Defense counsel moved for a directed verdict, but the motion was stayed until the State decided if it was going to present rebuttal evidence. The parties then held a jury instruction conference. The State objected to the use of any self-defense instruction claiming the burden had not been met. The court overruled the objection and allowed the self-defense jury instructions. After noting that many of the jury instructions were erroneous, court ended the day with directions to the attorneys to fix the instructions.

¶ 40     The trial resumed the following day, and the revised jury instructions were submitted with no objection. The State then requested the court provide an "initial aggressor" Illinois Pattern Instruction, Criminal, Nos. 24-25.09 (Initial Aggressor's Use of Force) and 24-25.09X (Non-Initial Aggressor—No Duty to Retreat) (hereinafter IPI Criminal Nos. 24-25.09 and 24-25.09X). IPI Criminal No. 24-25.09 states:

> "A person who initially provokes the use of force against himself is justified in the use of force only if
>
> [1] the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person.
>
> [or]

[2] in good faith, he withdraws from physical contact with the other person and indicates clearly to the other person that he desires to withdraw and terminate the use of force, but the other person continues or resumes the use of force."

IPI Criminal No. 24-25.09X states, "A person who has not initially provoked the use of force against himself has no duty to attempt to escape the danger before using force against the aggressor." Defense counsel objected to both instructions.

¶ 41    The court allowed instruction No. 24-25.09 stating:

"Well, I understand the arguments on both sides. This is a unique situation where really the *** battle was between the two women, and the man got in between and may have escalated it, it may not have, it's for the jury to determine. I don't think her walking into the situation is the provocation here. She has the right to be there and to have conversation with Rona and others, I don't think that's what provokes the use of force. But it's my recollection, and I think [defense counsel] agrees, that although the knife [was] like a switchblade, the knife can come out. It was not out at first, but she has the knife in her hand, everybody sees the knife handle in her hand. She's the one who produces it. It's not out at that moment, but I think that that does sort of escalate it from a verbal altercation to something more serious when she brings out the knife, even if it's not exposed, because that's just upping the ante, so to speak, and eventually she does expose it, which escalates things at that point. So I'm going to note the defense objection, I am going to allow 24-25.09."

¶ 42    The court also allowed instruction No. 24-25.09X stating:

17

"Well, this is a close call. It kind of goes hand in hand with the initial aggressor's use of force instruction, which I just allowed. There is varying testimony here, it's in contradiction, and the defendant did say that he was an aggressor, and that she was protecting herself when she stabbed him.

I think both parties have asked witnesses, could you have just walked away, and I think reluctantly everybody said yeah, I guess I could have, so everybody had the ability to walk away and nobody did. But I think when it comes to jury instructions and telling the jury what the law is, I think this is an appropriate statement and if *** the jury finds that Lavell was not the initial aggressor, I think the law is clear that he has no duty to attempt to escape. They may not find that. They may find he was the initial aggressor, in which case this would not apply. But I think it is appropriate to advise the jury on the law. I'm going to overrule the defense objection and grant it."

¶ 43 Thereafter, the State advised the court that it was going to publish portions of Officer Kristenson's body camera video that contained three interactions with defendant. The State advised the court that the video was to rebut defendant's testimony regarding Lavell tackling her and stating that someone threatened to kill her. The portions of the video were published to the jury and the State rested. Defense counsel moved for a directed verdict, which was denied.

¶ 44 The court read the jury instructions, including IPI Criminal Nos. 24-25.09 and 24-25.09X, after reading the jury instruction for self-defense. IPI Criminal No. 24-25.09 was read as follows:

"A person who initially provokes the use of force against himself is justified in the use of force only if the force used against him is so great that he reasonably believes that he is in imminent danger of great bodily harm, and he has exhausted every

18

reasonable means to escape the danger other than the use of force which is likely to cause great bodily harm to the other person. Or in good faith he withdraws from physical contact with the other person and indicates clearly to the other person that he desires to withdraw and terminate the use of force, but the other person continues or resumes the use of force."

The court then read IPI Criminal No. 24-25.09X stating, "A person who has not initially provoked the use of force against himself has no duty to attempt to escape the danger before using force against the aggressor."

¶ 45    Following the jury instructions, the parties then provided closing argument. The State argued that the statutory elements were shown and said, "The only thing we're sitting here for you all to decide is if she is allowed to do what she did, and I do not believe that she is allowed to do that. I do not believe that she acted in self-defense." After going through the incident, the State argued:

"One, ladies and gentlemen, I suggest to you [that] you do not take her word at face value because she lied to you twice yesterday on the stand: That's why we watched that body cam. I do my job. I watched it. The officer watched it, and where did she ever say to the officer, she threatened to kill me? Not once in those three times did she ever say, at the time of the incident she threatened to kill me. I gave her the opportunity when I stood right here and said that's on body cam. You never said that. Yes, I did. She doubled down. Proof right there. She said Lavell tackled me in a football-style way into the car. Not once did she say that to the police officers. Those are what are called self-serving statements so that the jury says well, she said it, it must be true.

19

Well, she lied twice to you, ladies and gentlemen. What else is she lying about? Because she is the only person that gives her version of events. There has been zero shown to you against what I have said, that Lavell went there acting as a peacemaker. This is completely self-serving on her point. This is the knife she had. She wants to say it was merely a pocket knife. It was closed in her hand the whole time. I suggest to you, ladies and gentlemen, one thing. I carry a pocket knife from time to time, too. Not allowed to in the courthouse. If you're carrying a pocket knife in a normal manner, it's sitting like this/(indicating) You're speaking with somebody. Is that person aggressive whatsoever? They have a knife on them. Does it matter? You might go to a job site, people have boxcutters, they've got all sorts of tools. If you come up to somebody and now all of sudden you're holding a knife in your hand, and you're pointing your finger at them. You're yelling at them. You're getting in that person's face. And you're holding a knife? That changes the ball game, ladies and gentlemen. You could be out playing baseball, holding a bat. That's not aggressive. You take that bat up, depending on what you're doing that bat becomes a weapon, doesn't it?

That's how quick it opens up, ladies and gentlemen. That's how quick that knife opens up. So don't let the argument, sitting here saying oh, it's just a knife in her hand. That's how quick that knife opens up, how quickly she stabbed Lavell Fleming two times in the leg. This, with an aggressive person in your face, doesn't need to be open for you to be scared. I would agree that if it is open, big difference. But she comes to this situation by her own admission, that doesn't involve her, has

20

a knife on her the entire time. Now notice you don't hear it from Rona or Lavell that they actually even noticed the knife the first time. Did you? ***

Lavell has no duty to run away: Lavell wasn't the person who was the aggressor in this situation. Lavell didn't do anything except try and stop the situation from happening, and in so doing got himself stabbed, ladies and gentlemen.

*** What person, with their mother involved, with a two-year-old daughter involved, themself, a pregnant girlfriend standing there, who wouldn't be a bit concerned with somebody with a knife? She wants to take the stand and give— I can't even call them alligator tears because there were no actual tears that happened when she sat up there, ladies and gentlemen. There were sounds, I didn't see a tissue rub the eyes once."

¶ 46    Defense counsel's argument was based on self-defense and explained that in addition to the elements of the alleged crimes, the State also had to convince the jury beyond a reasonable doubt that defendant was not entitled to use self-defense, that she was not entitled to protect herself. Counsel further explained that defendant told police that she received a threat but did not say she was threatened to kill and further stated that she was tackled into the car but did not say "football tackle." Counsel argued that those statements did not make defendant a liar. She further argued that defendant was not the aggressor and further referenced Lavell's testimony about being afraid to take the machete from Rona's hand. Counsel also addressed defendant's testimony about Rona flicking and slapping her. Counsel played the cell phone video and argued about how Lavell handled defendant prior to the stabbing.

¶ 47    In response, the State argued:

"You have zero legal basis when somebody grabs you to pull out a knife. And mind you, she already had the knife in her hand. That's what they want you to forget. She was the one who came to this situation as the aggressor, with the knife in her hand. You don't get to jump out of your car with a knife because someone flicked you in the nose, all right? *** She had the knife. Lavell felt threatened. He told you that. He has a right to protect himself. She doesn't get to just say, oop[s], he grabbed me, I can just stab him with the knife. That is not—you cannot do that. They want you to overlook that and say yeah, he's a guy, she's a woman, so yeah, you get to pull out a knife and just stab somebody. The thing that they want you to overlook in this situation is that she was the initial aggressor. She was the one that came there. She had the knife in her hand the entire time. She could have left the situation. She came back, she fired it up again because she says she gets flicked in the nose. She pulls out that knife. At that point that knife is out. Lavell Fleming has no duty legally to do anything. He doesn't have to run away. He absolutely can defend himself, and if he felt defending himself was by trying to grab her and disarm that knife, he absolutely can do that, ladies and gentlemen. She doesn't get *carte blanche* to say I'm a woman, I've got a knife out, I'm acting like a crazed lunatic. I don't *** like that you're grabbing me from behind, so I'm going to stab you a bunch of times. They're trying to make this completely about Rona. They're trying to make this about an incident with Lavell that doesn't exist, and there's no evidence to show any of it other than the defendant's statement saying something happened prior.

The facts that are here *** is that she showed up. She got in Rona's face. She produced the knife. She could have gone back and done a number of different

things. She came out of that car with the knife, and by everyone's account at that point the knife blade was open. Everybody's account except the defendant's. But Lavell Fleming was not in the wrong for trying to separate a hostile situation, and doing so when someone came out of a car in a crazed manner, coming after his family members, and who knows him, if it was him, because her own testimony was that Lavell was focusing on her, he was saying get back. He had no duty to not do anything. He did what he should have done, what anybody else likely might have done in that situation if their family members were involved, and he absolutely did not deserve to get stabbed by her. It's absolutely a weak excuse on her part, and I find no legal basis for that, ladies and gentlemen. She is guilty beyond any and all reasonable doubt of aggravated domestic battery, and aggravated battery in a public place."

¶ 48 Following closing arguments, the jury was sent to deliberate at 10:55 a.m. At 11:15 a.m. the jury sent two questions to the court. The first requested to view the cell phone video again. Both parties agreed they should see the video and it was decided that the jury would be returned to the courtroom to watch the video. The second question asked if they needed to decide whether great bodily harm occurred and, if so, the definition for great bodily harm. Both parties agreed the jury needed to figure that issue out on their own so the court stated the jury would be advised that they had all the instructions of law they needed to decide the case and should just continue the deliberations. The jury was returned to the courtroom. The court spoke to the jury saying:

"Please be seated. Ladies and gentlemen, we did get your note, there's two parts to it. We're going to take them one at a time. The first is can we see the cell phone

23

video again? The lawyers have agreed to allow to you see it, and we've moved the television up much closer so we're going to allow you to watch it one time."

¶ 49   The video was then played to the jury. Following the video, the court advised the jury that they had all the instructions of law needed to make the decision. It concluded by saying, "So at this time I'm going to ask you all to go back and continue your deliberations, okay? Thank you very much." The jury then retired for more deliberations at 11:40 a.m. The jury reached its verdict at 2:15 p.m. The court read the verdict which found defendant not guilty of aggravated domestic battery but guilty of aggravated battery. The jury was polled and released. The court ordered the preparation of a presentence investigation report (PSI) and set sentencing for December 20, 2022.

¶ 50   On November 30, 2022, defense counsel filed a motion for acquittal, or in the alternative, a motion for a new trial. The motion contended that the State failed to prove defendant guilty of the charge beyond a reasonable doubt. The motion also argued that the court erred in denying the requests for directed verdict following the closure of the State's evidence and after State's rebuttal evidence and erred in allowing jury instructions IPI Criminal Nos. 24-25.09 and 24-25.09X. The motion further argued that the guilty verdict was against the manifest weight of the evidence, and no rational jury could find the State proved defendant guilty of the offense beyond a reasonable doubt.

¶ 51   On December 20, 2022, the trial court first addressed the posttrial motion, stating the issues were addressed at the time of the directed verdict and during the jury instruction conference. It believed "the court's rulings were appropriate" as was the "jury's verdict" which was not against the manifest weight of the evidence. The court denied the posttrial motion and moved to the sentencing hearing. No objections or revisions to the PSI were necessary. The State argued for 30 months' probation. Defense counsel requested 12 months' probation. Defendant provided a

24

statement in allocution. Thereafter, the court sentenced defendant to 24 months' probation. Defendant appeals.

¶ 52                                                    II. ANALYSIS

¶ 53     Defendant raises five issues on appeal. She contends (1) the State failed to prove beyond a reasonable doubt that she was not acting in self-defense when Lavell was stabbed, (2) the court denied her a fair trial by allowing the "initial aggressor" jury instruction because there was no evidence she was the initial aggressor and allowing the instruction made the self-defense instruction confusing, (3) the court denied her a fair trial when it restricted the jury to a single viewing of the video evidence during deliberation, (4) the prosecutor committed misconduct during closing argument by providing his own personal opinion and misstating the law and evidence, and (5) defense counsel was ineffective for failing to object to the jury instructions, the State's misconduct during closing argument, and the court limiting the jury to only one view of the evidence during deliberations. The State disagrees, repeatedly arguing that the issues raised do not involve Rona and solely involve defendant and Lavell. The State requests affirmation of defendant's judgment and sentence.

¶ 54     Defendant first argues that the State failed to prove beyond a reasonable doubt that she was not acting in self-defense. "Self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Lee*, 213 Ill. 2d 218, 224-25 (2004) (citing *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995)). In order to show self-defense, the defendant must show: "(1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively

25

believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable." *Id.* at 225; see 720 ILCS 5/7-1(a) (West 2020). "If the State negates any one of these elements, the defendant's claim of self-defense must fail." *Lee*, 213 Ill. 2d at 225 (citing *Jeffries*, 164 Ill. 2d at 127-28).

¶ 55    The second part of section 7-1 states:

"In no case shall any act involving the use of force justified under this Section give rise to any claim or liability brought by or on behalf of any person acting within the definition of 'aggressor' set forth in Section 7-4 of this Article *** against the person *** using such justified force, unless the use of force involves willful or wanton misconduct." 720 ILCS 5/7-1(b) (West 2020).

¶ 56    Section 7-4 states:

"The justification described in the preceding Sections of this Article is not available to a person who:

(a) Is attempting to commit, committing, or escaping after the commission of, a forcible felony; or

(b) Initially provokes the use of force against himself, with the intent to use such force as an excuse to inflict bodily harm upon the assailant; or

(c) Otherwise initially provokes the use of force against himself, unless:

(1) Such force is so great that he reasonably believes that he is in imminent danger of death or great bodily harm, and that he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the assailant; or

26

> (2) In good faith, he withdraws from physical contact with the
> assailant and indicates clearly to the assailant that he desires to withdraw
> and terminate the use of force, but the assailant continues or resumes the
> use of force." *Id.* § 7-4.

¶ 57    On review, we consider whether, "after considering the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, that defendant did not act in self-defense." *Lee*, 213 Ill. 2d at 225 (citing *People v. Young*, 347 Ill. App. 3d 909, 920 (2004)). As such, we consider the evidence but first note that the State's recitation of the evidence, both in its brief and at oral argument, is inconsistent with the record before us.

¶ 58    The first altercation involved Rona and defendant.[1] This incident occurred shortly after Rona, Lavell, and Ivory left Ulta, and saw defendant in the parking lot. While it started as a verbal confrontation, the evidence reveals that the verbal altercation escalated to pointed fingers and eventually a physical confrontation when Rona pushed defendant in the parking lot. Lavell got between defendant and Rona, grabbed defendant's shoulders, and told defendant to get out of his mother's face. Lavell's actions broke Rona and defendant apart and the parties then removed Lavell's child from defendant's car.

¶ 59    The second altercation started with Rona flicking defendant's nose while defendant was seated in the car. After defendant refused to leave her car, Rona flicked defendant's nose a second time. After flicking defendant twice, Rona smacked defendant when defendant continued to point her fingers at Rona. Rona then told defendant that was "not what you want to do."

---

[1]There is no evidence that the shoulder bumping between defendant and Lavell occurred on the day of the incident. Accordingly, it is relevant only to address the underlying basis of the incidents that occurred on March 1, 2022.

¶ 60    The third altercation[2] occurred when Rona returned with her machete. According to Courtney, Lavell was telling defendant "my mom's crazy, stay away." Lavell testified that he then stepped between Rona and defendant, heard a click, grabbed defendant's arm with the knife, lost control of defendant's arm, and was stabbed by defendant. After Lavell was stabbed he threw defendant to the ground and climbed on top of defendant while she was on the parking lot ground. It was at this time that defendant stabbed Lavell a second time. Rona returned with her machete to where Lavell had defendant pinned to the ground, dropped her machete, and punched defendant in the head three times. Scott took the knife from defendant's hand and Rona then picked up her machete and handed it to Scott, who walked away with both items. Defendant was eventually released by Lavell. She ran to her car, turned around with both arms in front of her head to look at Lavell and Rona, then turned back around, and got into her car. Thereafter, Rona repeatedly beat on defendant's car.

¶ 61    On a sufficiency of evidence claim regarding self-defense, this court is required to view the evidence in a light most favorable to the State to determine if any rational trier of fact could have found beyond a reasonable doubt defendant did not act in self-defense. *Lee*, 213 Ill. 2d at 225. As such, this court will accept reasonable inferences stemming from the evidence and resolve conflicting evidence in the State's favor because that is a duty of the jury. See *Young*, 347 Ill. App. 3d at 920; see also *People v. Jimerson*, 127 Ill. 2d 12, 43 (1989). Instead, the reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt concerning the defendant's guilt. *People v. Molstad*, 101 Ill. 2d 128,

_____

[2]While defendant testified that Lavell tackled her after defendant told Ivory to stop rummaging through bags in defendant's car, the testimony was not corroborated by the State's witnesses, and the jury was not required to accept the testimony as true. See *People v. Holtz*, 19 Ill. App. 3d 781, 790 (1974) ("The trier of fact need not accept as true testimony concerning self-defense presented by the accused."); *People v. Easter*, 102 Ill. App. 3d 974, 980 (1981) (same). Since we must view the evidence in a light most favorable to the State, this alleged altercation is not considered in our analysis.

133 (1984). While we defer to the jury's findings on the credibility of witnesses and the reasonable inferences to be drawn from the evidence, those findings are not conclusive. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). "A conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of defendant's guilt." *Id.* (citing *People v. Smith*, 185 Ill. 2d 532, 542 (1999)).

¶ 62    The State argues that the jury believed defendant did not act in self-defense and therefore, the case should be affirmed. In addressing the elements of self-defense, it first argues that defendant was not threatened with unlawful force. In support, the State argues, "Defendant possessed a dangerous, illegal switchblade.[3] Initially, it was closed but it can and was opened with a flick." It further argues that Lavell "attempted to continue his role as peacemaker, stepped in between defendant and [Rona]. He knew defendant had a switchblade and he heard it open. Placing her in a bear hug was not unlawful force."

¶ 63    Notably the State's argument fails to address any of Rona's actions during the altercations. Here, as at trial, the State argues that the only altercation that should be considered is the one between Lavell and defendant. However, no citation to support the contention that only Lavell and defendant should be considered was provided and we have found no case law requiring the fact finder from considering the entire incident as opposed to only considering the final moments when the violence occurred. Indeed, in some instances the altercations can be lengthy and even interrupted by other people, but all of the incidents are considered. See *People v. Guja*, 2016 IL App (1st) 140046, ¶¶ 53, 55; *People v. McGrath*, 193 Ill. App. 3d 12, 28-29 (1989) As such, we

---

[3]The State repeatedly classifies defendant's knife as an illegal switchblade despite acknowledging that the classification was neither a fact nor an argument presented at trial. "It is axiomatic that arguments may not be raised for the first time on appeal. [Citation.] This prohibition is equally applicable to the State as to a defendant in a criminal case." *People v. Estrada*, 394 Ill. App. 3d 611, 626 (2009). We further note, contrary to the State's argument, that the State's citations to the record do not confirm the State's classification.

disregard the State's unsupported conclusion. See Ill. S. Ct. R. 341(i) (eff. Oct. 1, 2020) (incorporating briefing requirements of Ill. S. Ct. R. 341(h)(7) that include citation of authority in support of argument).

¶ 64 The evidence reveals, and it is undisputed, that Rona escalated every altercation with defendant. When they were yelling, Rona pushed defendant. When defendant was in her car, Rona twice flicked defendant's nose and later slapped her. When Rona saw defendant had a closed knife, Rona returned with a machete. Even reviewing the evidence in a light most favorable to the State which would have defendant brandishing an open knife toward an unarmed Lavell, based on the State's evidence, Rona's machete remained in such close proximity to defendant—no more than 10 feet based on Rona's testimony—that this court cannot find that the State negated the element of unlawful force threatened against defendant.

¶ 65 The second element requires defendant not to be the initial aggressor. The State argues that defendant had an open switchblade when Lavell stepped between defendant and Rona and "simply put her in a bear hug." The remainder of the argument discusses the prior romantic relationship between defendant and Lavell and argues that defendant stabbing Lavell twice in reaction to Lavell's bear hug was disproportionate. If those were the only facts at issue, we might agree.

¶ 66 While this court reviews the evidence in a light most favorable to the State, this court cannot ignore the State's evidence that repeatedly confirmed Rona aggressive actions and close proximity to defendant with easy access to a machete when Lavell grabbed defendant. While it is undisputed that Lavell was unarmed, it is equally undisputed that Lavell was attempting to restrain defendant while his mother was: (a) actually holding a machete based on Lavell's testimony, (b) the machete was in a truck 10 feet away based on Rona's testimony, or (c) was on the ground at Rona's feet based on defendant's testimony. Viewing this evidence in a light most favorable to

30

the State would have Rona either walking the machete back to her truck or at the truck with the machete, which was a mere 10 feet away from Lavell and defendant. Further, Lavell stated that he spun defendant around when he tried to restrain her which, based on the video, made it impossible for defendant to see where Rona was located with her machete.

¶ 67    The State's reliance on *People v. Banks*, 227 Ill. App. 3d 462, 474 (1992), and *People v. Belpedio*, 212 Ill. App. 3d 155, 161 (1991), to support its claim that defendant was the initial aggressor, is gratuitous at best. Both cases are easily distinguishable. In *Banks*, the record revealed that the defendant was the first to make physical contact against both the decedent and victim and the defendant verbally threatened to kill the unarmed decedent before shooting the decedent and two others. *Banks*, 227 Ill. App. 3d at 474-75. Here, defendant never made first contact and issued no verbal threat to either Rona or Lavell. *Belpedio* involved the defendant punching an opponent in the face during a touch football game after the victim elbowed the defendant when he was trying to make a catch. *Belpedio*, 212 Ill. App. 3d at 162. While the victim in *Belpedio* made the first physical contact, which is similar to the facts here, the victim's contact was part of a touch football game and defendant's punching the victim was pure retaliation for the victim's initial interference during the catch. Here, there was no evidence submitted that defendant stabbing Lavell was in retaliation for any previous action by Lavell. In fact, Rona's testimony confirmed that defendant abandoned the fight when she returned the closed knife to her car after Rona appeared with a machete. Despite defendant's attempt to abandon the altercation, Rona walked to defendant's car and flicked defendant twice. Regardless, because no argument regarding retaliation was previously raised, the argument is disregarded. See *Estrada*, 394 Ill. App. 3d at 626.

¶ 68    Here, the State's evidence revealed that Rona was the aggressor in every situation. Notably, defendant's knife was closed when Rona approached defendant with the machete. Illinois case law

31

reveals that holding a closed weapon may not constitute aggression. See *People v. Salazar*, 126 Ill. 2d 424, 452 (1988) (officer carrying a sheath knife on his left leg without department permission does not prove aggression). In fact, even holding an open weapon might be seen as "a defensive gesture." *People v. Cruz*, 2021 IL App (1st) 190132, ¶ 56 (citing Ill. Ann. Stat., ch. 38, ¶ 7-4, Committee Comments-1961 (Smith-Hurd 1964). While the State's argument relies solely on the interaction between Lavell and defendant, we cannot ignore the exigent circumstances occurring immediately prior to Lavell grabbing defendant and, as noted above, the State provides no legal basis to support its exclusion of evidence. Accordingly, even viewing the evidence in a light most favorable to the State this court cannot find that the State negated the element requiring defendant to not be the initial aggressor.

¶ 69    The third element requires the State to show that defendant was not in imminent danger of harm. Once again, the State attempts to limit the court's consideration solely to the actions of Lavell but again provides no legal basis to do so. The argument remains unsatisfactory. See Ill. S. Ct. R. 341(i) (eff. Oct. 1, 2020). While the State continues to contend Rona is irrelevant, it finally addresses Rona by arguing that she "was a future threat, not a present one." Once again, the State provides no facts to support the conclusion. See *id.*

¶ 70    There is no dispute that Rona was wielding a machete at some point during the third altercation. It was also undisputed that even Lavell was too afraid of his mother to even try to take away Rona's machete, yelled at defendant to get away from Rona, and called his mother "crazy." Further, contrary to the State's unsupported argument, Rona's threatening behavior occurred in the present. Lavell testified that he grabbed defendant the second time because he was worried someone would get hurt badly because "one person had a knife and the other had a machete." Rona testified that the machete was in the truck when Lavell grabbed defendant. Defendant testified that

Rona dropped the machete on the ground before Rona slapped her and that Lavell grabbed her immediately after Rona slapped her. While the evidence is conflicting, even if this court views the evidence in a light most favorable to the State, at best Rona and her machete were never more than 10 feet away from defendant when Lavell grabbed defendant. Equally relevant is the fact that Rona admitted and the video confirmed that while Lavell was struggling with restraining defendant, Rona was returning to the area with her machete. Rona's actions did not indicate a threat that would occur at some time in the future; her actions were seated in the present and, therefore, imminent. See *Kessler v. State*, 850 S.W.2d 217, 222 (Tex. App. 1993) (defining "imminent" as ready to take place, near at hand, impending, hanging threateningly over one's head, menacingly near, certain, immediate, impending, threating to occur immediately, near at hand, on the point of happening, threatening, menacing, and perilous to name a few). As such, even after reviewing the evidence in a light most favorable to the State, we cannot hold that the State negated the element that the danger of harm was imminent.

¶ 71    The fourth element requires the State to show that the use of force was unnecessary. Here, the State argues that that the "saying made famous in the movies about not bringing a knife to gun fight" was applicable, because "defendant brought a switchblade to an argument." In support, the State relies on *People v. Baggett*, 115 Ill. App. 3d 924, 932 (1983). In *Baggett*, the defendant shot the victim after being called names and shoved one time. *Id.*

¶ 72    If we were constrained to limit the confrontation to that of Lavell and defendant, *Baggett* might have relevance. However, the confrontations included more than just Lavell and defendant. Once again, the State omits any mention of Rona or her machete and fails to provide any legal basis as to why Rona's machete would not be applicable to the analysis or how defendant holding a closed knife would be disproportionate to Rona's machete. It is equally relevant that Lavell, who

33

was unquestionably larger than defendant and had wrestling experience, was restraining defendant while Rona still had access to the same machete that she had just threatened defendant with and that Rona was returning to the area with the machete. Finally, this court also notes that as soon as defendant freed herself from Lavell, she immediately ran to her car to get away from Lavell and Rona. Accordingly, even after reviewing the evidence in a light most favorable to the State, we cannot find this element was negated.

¶ 73    The fifth element requires the State to show that defendant did not actually and subjectively believe a danger existed that required the use of force. "It is well settled that the test in self-defense is not what the jury thinks a reasonable man would believe, but rather what the defendant, as a reasonable man, believed." *People v. McClain*, 410 Ill. 280, 287 (1951) (citing *People v. Grady*, 381 Ill. 224 (1942)); see also *People v. Johnson*, 2 Ill. 2d 165, 172 (1954).

¶ 74    Here, the State argues that defendant had no reason to fear Lavell because he was unarmed. In support, the State cites *People v. Davis*, 33 Ill. App. 3d 105, 109-10 (1975). In *Davis*, the defendant fired a warning shot, turned to leave, had her wig pulled off her head, was threatened that she would be killed, and turned around and shot the victim. *Id.* If the interaction was solely between defendant and Lavell, *Davis* might be relevant. However, similar to above, the State provided no argument regarding Rona and her machete. Defendant testified that she was terrified when Rona came toward her with the machete and was also terrified when Lavell grabbed her after Rona slapped her. The video confirms defendant was screaming and flailing her legs in an attempt to get out of Lavell's grip. Accordingly, we cannot find sufficient evidence supports the State's claim that it negated this element.

¶ 75    The final element requires the State to show that the defendant's belief of a threat was not objectively reasonable. In support, the State contends that defendant "knew, or should have known

34

[Lavell] was not going to hurt her" because he previously intervened between defendant and his mother and defendant "had no reason to believe he was doing anything else at the time she stabbed [Lavell]." The State further argues that "defendant agreed [Rona] did not have her machete at the time, so defendant was in no danger from a third-party when [Lavell] restrained her." The State concludes by stating that defendant's belief that she needed to use a five-inch switchblade to protect herself was not objectively reasonable, "[t]he jury agreed," and the reasonableness of "defendant's resort to force and the amount of force used are factual determinations solely for the trier of fact."

¶ 76    We first address Lavell's actions. As noted above, if Lavell's actions were indeed limited to only trying to break up the fight between his mother and defendant, and Rona was no longer at the scene, the State's argument might have merit. However, the unrebutted evidence revealed that Rona and her machete were never more than 10 feet away from defendant based on Rona's testimony and was much closer based on Lavell's testimony. As noted above, it is more than objectively reasonable for defendant to fear being restrained by someone larger than herself when Lavell described his mother as "crazy," Rona had easy access to a machete, and remained in close proximity to defendant.

¶ 77    The State's argument regarding defendant's testimony that Rona did not have her machete is equally disingenuous. As such, we include a full summary of defendant's testimony prior to that statement. Defendant's testimony begins with Rona moving toward defendant, who was in her own vehicle, with the machete. Rona tells defendant "you play with boxcutters, this is what I play with, B. I will kill you." Defendant states that she "absolutely" felt threatened by Rona at that time. After Rona got her machete, defendant testified that she returned to her car so she could leave. She handed Morgan her phone out the driver's side window and Rona walked over and flicked

35

defendant in the nose. Defendant got out of her car and told Rona not to touch her. Rona responded by flicking her nose again and getting into a fighting stance. Rona then said, "I just touched you twice and you didn't do anything." Defendant said, "You didn't touch me, you flicked my nose." Rona then slapped defendant. Defendant clarified that after Rona "flicked my nose twice she dropped the machete to the ground," and "that's when she slapped me." Defendant stated that after Rona's slap, Lavell grabbed defendant. The video revealed that when Lavell grabbed defendant, he spun her around, smashed her on the hood, picked her body up in the air, and slammed defendant down to the ground.

¶ 78   While the State claims defendant's fears were not objectively reasonable, if we are basing the case on defendant's testimony, the evidence revealed that even if Rona did not have the machete at the exact moment Lavell attempted to restrain defendant—the machete was on the ground at defendant's feet. The evidence also reveals that Rona picked up the machete while Lavell was trying to detain defendant and returned with the machete after defendant was pinned to the ground under Lavell. Even considering the evidence in a light most favorable to the State, it is undisputed that Rona picked the machete up while Lavell was detaining defendant and returned with the machete after defendant was pinned to the ground.

¶ 79   Finally, the State argues that "[t]he jury agreed" that defendant's "belief that she needed to use a 5-inch switchblade to protect herself from [Lavell] was not objectively reasonable" and the reasonableness of defendant's use of force and the amount of force "are factual determinations solely for the trier of fact to decide." This court is well aware that it is the function of the jury to assess the credibility of the witnesses, the weight to be given their testimony, the inferences to be drawn from the evidence, and to resolve conflicts or inconsistencies in the evidence. *Lee*, 213 Ill. 2d at 225. However, the jury was also told that the "trial isn't about Rona Wiley," and the

36

prosecutor then focused solely on the interaction between Lavell and defendant except to assert that Rona—despite carrying a machete—was not an aggressor, but defendant holding a knife—even if it was closed—was an aggressor.

¶ 80    The law of this state has long held that, "[w]hen a person is assaulted in such a manner as to induce a reasonable belief that [she] is in danger of loss of life or great bodily harm [she] may exercise [her] right of self-defense whether the danger is real or only apparent." *Johnson*, 2 Ill. 2d at 171. Even viewing the evidence in a light most favorable to the State, we do not see how a finding that the State negated the element requiring that defendant's belief of a threat be objectively reasonable, is even possible.

¶ 81    Due to its failure to address Rona and the unsupported contention that any altercations between Rona and defendant were merely "red herrings," we find the State's arguments unpersuasive, at best. We are aware of no legal basis, and the State failed to present one either at trial or on appeal, that constrains the factfinder, to only consider the last actions of violence in a series of altercations that undoubtedly escalated over time when the same parties were present for each altercation. When the focus of the case involves the entire incident rather than on the last act, we do not see how any rational trier of fact could have found, beyond a reasonable doubt, that the defendant did not act in self-defense. Accordingly, we reverse defendant's conviction for aggravated battery. As the conviction must be reversed, we need not address defendant's four remaining issues on appeal.

¶ 82                                  III. CONCLUSION

¶ 83    For the above-stated reasons, we reverse defendant's conviction for aggravated battery.


¶ 84    Reversed.

37